

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 14, 2016**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CHINIQUE WARD, | § | CASE NO. 14-35255-SGJ-13 |
| | § | (Chapter 13) |
| Debtor. | § | |

### MEMORANDUM OPINION AND ORDER DENYING DEBTOR'S MOTION TO RECONSIDER ORDER DENYING DEBTOR'S MOTION TO INCUR DEBT TO ACQUIRE CAR DURING BANKRUPTCY CASE [DE # 61]

## I. INTRODUCTION.

This Memorandum Opinion and Order addresses an individual debtor's motion to borrow funds, during the middle of her Chapter 13 case, at an exorbitant interest rate, to acquire a new (actually, used) vehicle for personal use. The case at bar has forced this court to ponder "what is a bankruptcy court to do" when presented with a motion such as this, when: (a) a car financing arrangement proposed seems dreadfully unreasonable (here, 20.25% interest rate) and wholly inconsistent with the purposes of rehabilitation; (b) the debtor's need for a vehicle was not brought on by calamity (such as a car accident or costly repairs on a very old car) but, rather, the debtor's failure to maintain insurance on her perfectly-good original car during her case

1

(causing a lift stay and repossession of that car); and, nevertheless (c) the debtor's plan may have a greater probability of success (and her life would no doubt be easier) if she had a vehicle. Unfortunately, the facts are more complicated than just this. The court learned during the hearings on this matter that the car dealership that the debtor has proposed to use: (a) targeted the debtor with a mailed advertisement (in fact, the car dealership targets debtors-in-bankruptcy as their primary customers, through mass mailings of approximately *2,400 advertisements per week* to individuals who show up in public data bases as currently being in bankruptcy in this district); (b) paid the debtor's attorney's fees associated with the filing of the motion to incur debt on behalf of the debtor (without any disclosure of that, until it inadvertently was disclosed by the debtor in testimony before the court); (c) the car dealership regularly pays different debtors' attorneys' fees for filing motions to incur debt in chapter 13 cases in this district without there having been any disclosure heretofore by anyone; and (d) the car dealership, in fact, gave possession of the vehicle to the debtor in this case *before the motion to incur debt was even filed*—accepting from her a down payment, one car payment, and the debtor even acquired insurance on the vehicle and named the car dealership's finance company as the loss payee before ever bringing the motion to incur debt to the court. *The debtor has subsequently driven and put 6,000 miles on the vehicle—all without the bankruptcy court approving the financing and purchase yet.* Apparently everyone involved thought that bankruptcy court approval was a foregone conclusion and that the motion to incur debt was a mere perfunctory exercise.

As explained further below, this court refused to join in the Kabuki dance[1] to which it was invited and denied approving the debtor's motion to incur debt. The debtor then filed a

---

[1] This is a reference to Kabuki theater—the 400-year old Japanese dance-drama art form where all the men and women are merely players. This art form is sometimes used to refer to a pretense in politics where nothing substantive is really being pursued.

Motion to Reconsider Order Denying Debtor's Motion to Incur Debt (the "Motion to Reconsider") [DE # 61]. The Motion to Reconsider urges this court to reconsider its decision to deny the Chapter 13 Debtor's request to incur secured debt to purchase a used vehicle during her case. *See* DE # 59, Order dated December 13, 2015. For the reasons set forth below, the court now denies the Motion to Reconsider.

## II. BACKGROUND FACTS: THE DEBTOR'S ORIGINAL CAR, WHICH WAS ACQUIRED SHORTLY BEFORE THE PETITION DATE AND PROVIDED FOR IN HER CHAPTER 13 PLAN.

The above-referenced debtor (the "Debtor" or "Ms. Ward") filed a Chapter 13 case on November 3, 2014 (the "Petition Date"). At the time of filing her case, she owned one vehicle: a 2009 Mitsubishi Gallant (the "Original Car"), which she valued on her Schedule B at $8,500, indicating it had 90,000 miles thereon. *See* DE # 9. Her Schedule D indicated that a secured lender, Clay Cooley (the "Original Secured Lender"), was owed $13,671.89 on the Original Car. *Id.* The monthly payment thereon was $480 per month. The Debtor had been employed as of the Petition Date for ten years with the same employer as a tax service specialist with gross wages of $3,352 per month. *Id.* (the Debtor recently amended her Schedule I to show she is still at the same job, but with gross wages now of $3,991.43 per month; *see* DE # 58).

The Debtor initially proposed a chapter 13 plan [DE # 11] that contemplated a $652 monthly plan payment. Her plan proposed cramming down the Original Secured Lender on the Original Car, such that the car would be valued at $8,500 and paid over 60 months at an interest rate of 4.25%. Unsecured creditors would receive no distribution. The plan drew an objection from the Original Secured Lender on the Original Car. *See* DE # 22. The Original Secured Lender stated that the Original Car was a "910 vehicle" (*see* 11 U.S.C. § 1325(a)(5)) and, thus, its secured claim could not be crammed down below the amount then-owing ($13,426.31). Moreover, the Original Secured Lender argued that the proposed interest rate of 4.25% was not

reasonable, but that the Original Secured Lender would be agreeable to 5.25%. The Original

Secured Lender also filed a motion for relief from stay (the "Stay Relief Motion") on the same

date as it filed its plan objection. *See* DE # 23 (Exh. 2[2]). The Stay Relief Motion indicated that

the Debtor had purchased the Original Car on March 14, 2014 (*less than eight months before*

*filing her bankruptcy case*). The Stay Relief Motion indicated that the Debtor was in default on

the payments and had not provided proof of adequate insurance. Attached to the Stay Relief

Motion at Exhibit A was a Motor Vehicle Retail Installment Sales Contract, pursuant to which

the Debtor purchased the Original Car. Such contract was dated March 14, 2014. It reflected a

purchase price on the Original Car of $14,995, that the Debtor made a $1,500 down payment

thereon ($800 immediately and $700 deferred), and financed the remainder of the purchase price

(note that there were no "add-ons" except for $134.88 tax, title, and license) at the interest rate of

*23.91%* per annum over 48 months, resulting in a *$480* per month car payment. It also showed

that there were 73,952 miles on the Original Car when the Texas Certificate of Title was issued

on April 7, 2014 (Exhibit B to the Stay Relief Motion). The Debtor filed a response to the Stay

Relief Motion and an affidavit thereto, stating that she did not presently have full insurance on

the Original Car but understood that she must obtain it. *See* DE # 27. An Agreed Order was

thereafter entered into between the Debtor and the Original Secured Lender (the "Agreed Order",

DE # 30; Exh. 3) on January 20, 2015 (approximately two-and-one-half months into the case), in

which the parties agreed, among other things, that the Debtor was required to provide and

continue to provide proof of insurance on the Original Car and that in "the event that the

Debtor(s) shall fail to comply with the conditions as set forth above, the Court orders that the

---

[2] Exhibit citations herein, unless otherwise specified, refer to exhibits from the hearing on the Motion to Reconsider—since (as later described) the evidentiary prove up was more fullsome at such hearing than at the hearing on the original Motion to Incur Debt.

stay will automatically be modified to [the Original Secured Lender], and that [Original Secured

Lender] shall be allowed to proceed to immediately foreclose upon, repossess, and resell the

collateral." *Id.* p. 2. The Agreed Order also provided that the Debtor's plan would be required to

provide for plan payments to the secured lender of ***$402.40*** per month for 36 months, until the

sum of $13,426.31, ***plus 5% interest*** was paid (in other words, the Original Car would be

provided for as a "910 vehicle" in the plan, as required by section 1325(a)(5) of the Bankruptcy

Code—***although the Original Secured Lender was agreeing to a far lower interest rate than

the 23.91% contractual rate***).[3] Notices of default (and opportunity to cure on behalf of the

Debtor) were required of the Original Secured Lender, in the event of missed payments, but not

in the event of insurance defaults. The Debtor filed an amended plan on February 24, 2015, that

provided for treatment of the Original Secured Lender's claim in the manner required by the

Agreed Order (the payments to the Original Secured Lender would be made out of the $652 per

month plan payment; as with the original plan, unsecured creditors would receive no dividend).

*See* DE # 34.

In summary, the Debtor seemed well on the road to rehabilitation in the first few months

of her case. She obtained confirmation of a plan that (consistent with *Till*[4]) allowed her an

opportunity to ***significantly*** reduce her interest rate on her Original Car (that she had only owned

for eight months) ***from 23.91% to 5%***—although it was a "910 vehicle" that she could not cram

down pursuant to section 1325(a)(5) of the Bankruptcy Code. The Debtor would hopefully make

her plan payments, save her Original Car, and would presumably receive a discharge of her

---

[3] *See Till v. SCS Credit Corp.*, 124 S. Ct. 1951 (2004) (formula of adjusting prime rate based on risk of nonpayment is proper method for determining rate under section 1325(a)(5)(B) of the Bankruptcy Code).

[4] *Id.*

5

unsecured debt, upon plan completion, without having to pay any dividend to the unsecured creditors, due to her income level.

### III. THE DEBTOR'S FAILURE TO MAINTAIN INSURANCE (DUE TO THE SUSPENSION OF HER DRIVER'S LICENSE) AND ULTIMATE REPOSSESSION OF HER ORIGINAL CAR.

On October 20, 2015, the Debtor filed a plan modification requesting that her monthly plan payment be decreased from $645 per month [sic][5] to $507 per month, *to primarily account for a "surrender"[6] of the Original Car to the Original Secured Lender*. *See* DE # 52 (Exh. 4). While there was no notice of termination of the stay on the docket as to the Original Car, the Original Secured Lender apparently *repossessed* the Original Car for the Debtor's failure to maintain insurance thereon at some point between mid-July and mid-October 2015 (a review of the Agreed Order shows that the Original Secured Lender was not required to file a notice with the court if the stay terminated due to the Debtor's failure to provide proof of insurance). While the evidence regarding the particulars of this was very murky, the attachments to the Motion to Reconsider that is now before the court show that the Original Car was, indeed, repossessed for the Debtor's failure to provide proof of insurance *after several inquiries by the Original Secured Lender* and that, in fact, *the Debtor let her insurance lapse for a month on the Original Car*. Specifically, the attachments to the Motion to Reconsider (Exhibit G thereto) show that the Debtor had the Original Car insured with State Farm Insurance Company and such insurance expired on June 15, 2015, and the Debtor eventually arranged to have new insurance on the Original Car through Mercury Insurance Group, but not until July 15, 2015. *See* Exhs.

---

[5] The record seems to reflect that the Debtor had a $652 per month plan payment (not $645). Thus, the court is uncertain whether this was a typographical error. In any event, this $7 discrepancy is irrelevant for purposes of this analysis.

[6] In hindsight, this court is not sure "surrender" was the correct description for what really happened.

16-23.  The evidence was that the Debtor had a suspended driver's license due to unpaid traffic tickets that were several years old and this contributed to some extent to her difficulty with keeping/maintaining insurance.[7]  It appears that the Original Secured Lender was justified in repossessing the Original Car pursuant to the terms of the Agreed Order.

In any event, the Original Secured Lender objected to the Debtor's proposed plan modification after the Original Car's repossession [DE # 53; *see* Exh. 5], arguing that the Debtor could not attempt this post-confirmation modification-to-surrender,[8] and that the Debtor was required to still pay the Original Secured Lender's claim in full, less $2,948.68—which was the amount that the Original Secured Lender alleged it had obtained on resale of the Original Car. Thereafter, the parties reached a subsequent agreed order wherein they agreed that the Original Secured Lender was still entitled to have a secured claim under the plan (only reduced by the sale proceeds of the Original Car of $2,948.68, so that it was now paid down to $10,501.31), and the secured claim would still be paid over the life of the plan at the rate of 5% per annum, and, thus, **$402** per month, and that a modified plan would be filed to reflect such agreement.  *See* Exh. 6.  The court thereafter approved a modified plan that was consistent with the Debtor's and the Original Secured Lender's agreement.  The modified plan contemplated a reduced monthly plan payment of $507 per month for two months—then the plan payment increased to $690 per month for the remainder of the plan.  *See* DE # 57 (Exh. 7).

---

[7] The Debtor testified that she subsequently obtained reinstatement of her driver's license during this case.

[8] As earlier mentioned, this court is not sure "modification to surrender" was what was being proposed and, thus, the court is not sure what was ultimately negotiated was required.  *See In re Ramos*, 540 B.R. 580, 585 (Bankr. N.D. Tex. 2015) (distinguishing between a modification to surrender and a modification after a creditor takes affirmative action and repossesses collateral, resulting in a deficiency).

## IV.    THE DEBTOR'S DESIRE FOR A SECOND CAR:  THE MOTION TO INCUR DEBT

On November 16, 2015, the Debtor filed a motion to incur new debt in order to purchase a used car (the "Motion to Incur Debt").  *See* DE # 54 (Exh. 8).  To be clear, at the time of the filing the Motion to Incur Debt, the Debtor was under a confirmed plan that required **$690**-per-month plan payments, of which **$402** per month was being paid to the Original Secured Lender on its reduced claim.   In the Motion to Incur Debt, the Debtor requested court authority to purchase a 2011 Mazda 6 vehicle (the "Second Car") from "Reids Auto Connection" with financing not to exceed the amount of $18,000, and with payments not to exceed $475 per month.[9]  Attached to the Motion to Incur Debt at Exhibit A was a Motor Vehicle Retail Installment Sales Contract, dated November 11, 2015, showing, among other things, a purchase price of $16,477.34—of which, $13,200 was for the Second Car; $1,087.34 was for taxes and fees; and another $2,690 was for "Add-On Products" (Warranty and GAP insurance).  The contract reflected a $500 down payment, an applicable interest rate of 20.25% per month over 60 months, resulting in monthly car payments of **$438.85** for 60 months.  *See* Exhs. 9, 10, & 28.  Prestige Financial Services with an address in Salt Lake City, Utah, was shown as the intended lien holder (the "Second Car Lender").  Mileage on the vehicle was shown as 50,873.

The court held a hearing on the Motion to Incur Debt on December 10, 2015 ("Hearing #1"), and the court ultimately denied the Motion to Incur Debt, finding that the incurrence of debt, under the described terms and circumstances, was not in the best interests of the Debtor, not reasonable, and not consistent with sound business judgement.  The court noted the terrible

---

[9] It has heretofore been local protocol in this district for the Chapter 13 Trustee not to oppose a debtor's request to incur debt to purchase a vehicle during a chapter 13 case as long it was not a luxury vehicle and the price was no more than $18,000 and the monthly payment would be no more than $475 per month.  However, the chapter 13 trustee obviously takes a case-by-case analysis and may object if other factors seem problematic.

interest rate (20.25%) and the overall bad deal the financing seemed to present ($2,690 of "Add-On Products"?).

Overshadowing Hearing #1 somewhat was an unseemly fee issue. Specifically, it was revealed at Hearing #1 ***that Reid's Auto Connection had paid $500 to Debtor's counsel's firm to cover Debtor's counsel's fees in filing the Motion to Incur Debt***. Debtor's counsel, when questioned by the court about the propriety of this, expressed utter shock (expressing that this seemed no different than when a debtor's relative pays some of his attorney's fees, which is not unusual for a financially distressed individual). Debtor's counsel was somewhat vague in their recollection about who exactly dealt with whom on this—and stated that there was no formal agreement for the fee arrangement. In any event, on December 16, 2015—six days after the hearing in which the court raised concerns about the lack of disclosure, Debtor's counsel filed a Supplemental Disclosure of Compensation, pursuant to section 329(a) of the Bankruptcy Code and Bankruptcy Rule 2016(b), to disclose this $500 payment by Reid's Auto Connection. *See* DE # 60.

## V.     THE MOTION TO RECONSIDER.

Thereafter, the Debtor filed the Motion to Reconsider, urging this court to reevaluate its decision to deny approval of the postpetition financing. Debtor's counsel seemed to think the court's greatest concern had been about the price/value of the second car. The Motion to Reconsider argued that, based on Debtor's counsel's post-hearing review of the Kelly Blue Book, the Second Car was worth between $11,500-$14,556 (attaching an Exhibit A photocopy of a portion of the Kelly Blue Book showing this range of values for a vehicle such as the Second Car that is "Based on Good Condition or Better"; the court had no evidence of the condition of the Second Car at Hearing #1). *See* Exh. 13. The suggestion was that the Kelly Blue Book

supports the notion that the $13,200 purchase price for the Second Car (*i.e.,* the price before "Add-Ons") was reasonable. Moreover, the Motion to Reconsider compared the proposed new financing for the Second Car to the original financing on the Original Car—noting that the 20.25% interest rate on the Second Car was better than the 23.91% interest rate on the Original Car. In hindsight, this seemed like a somewhat irrelevant comparison—since the Debtor was able to reduce the interest rate on the Original Car down to *5%* under its confirmed plan (the court also notes, anecdotally, that there was not $2,690 worth of "Add-Ons" on the Original Car—thus, comparing the two interest rates is additionally not entirely "apples-to-apples"). The Motion to Reconsider also suggested that it was relevant that the proposed car payment on the Second Car (of $438.85 per month) was better than the $480 per month car payment that the Debtor had on the Original Car. In hindsight, this seems like a somewhat irrelevant comparison—since the Debtor was able to reduce the monthly car payment on the Original Car down to $402.40 per month under its confirmed plan. The court is well aware that the Original Car is "gone" now and the Debtor has no car.

The court held a hearing on the Motion to Reconsider on February 29, 2016 and March 4, 2016 ("Hearing #2"). The court heard further testimony from both the Debtor and Reid Anderson, the owner of Reid's Auto Connection. The testimony of the Debtor can be summarized as follows. After four to five months of being without a car during her bankruptcy case (after repossession of the Original Car), the Debtor responded to an advertisement she received in the mail from Reid's Auto Connection and telephoned the dealership and then went and visited. She found the personnel at Reid's Auto Connection to be nice and easier to deal with than at some other dealerships she had visited, because other dealerships she consulted wanted a larger down payment than she could afford (*e.g.,* $1,500; $2,500), and Reid's Auto

10

Connection also did not require too much documentation from her.  While the interest rate that Reid's Auto Connection offered her was high, she believed this was somewhat typical (although the Debtor stated that she never really got past discussions of down payments, at other dealerships, since the down payment that was typically requested was always too high for her). The Debtor commutes 45 miles to work every day and there is no public transportation available for the commute, so she had been riding with a co-worker before going to Reid's Auto Connection.  She has been at the same job for more than 11 years and she likes her job.  Her life has been much easier since getting the Second Car.  Upon further clarification, the Debtor revealed that *she had been driving the Second Car for over three months*.  Reid's Auto Connection let her drive the Second Car away on November 11, 2015, after she made her $500 down payment.  *She has put 6,000 miles on it*.  She subsequently made one monthly car payment and obtained insurance with the Second Car Lender shown as the loss payee. (Unmarked Exhibits produced at Hearing #2).  The Debtor testified that she had cleared up problems with her suspended driver's license in September or October 2015—before she went to Reid's Auto Connection.

The testimony of Reid Anderson can be summarized as follows.  He has been in the car business in the Dallas-Fort Worth area for 30 years.  He is the sole member of Reid's Auto Connection, a limited liability company.  His car business during the last seven years has been 100% focused on selling cars to individuals in bankruptcy.  He has entered into "thousands" of these transactions.  He obtains public filings regarding persons in bankruptcy cases.  He sends out *2,400 mailings per week* to persons in Dallas and Tarrant Counties, Texas, who are in bankruptcy, at a cost to his business of *$2,000 per week* (70 cents per copy).  *See* Exh. 24.  An example of the content of the mailed advertisements, taken from the one produced in court,

11

stated as follows: "CHAPTER 7 & 13 BANKRUPTCY FRESH START VEHICLE

PROGRAM! Can I get an auto loan with an OPEN Chapter 7 BANKRUPTCY? . . . . YES! Can

I get an auto loan with an OPEN Chapter 13 BANKRUPTCY? . . . . YES! Can I get an auto loan

with ANY OPEN BANKRUPTCY? . . . . ABSOLUTELY!" *Id.* The advertisement goes on to

provide: "Most loans have zero down payment." *Id.* The advertisement also provides: "Return

your current vehicle and get another one in Chapter 7 bankruptcy." *Id.* The advertisement also

contains the logo for Prestige Financial (*i.e.,* the "Second Lender"). Reid Anderson further

testified that he has a business location in Lewisville, Texas and opened a new location in Fort

Worth, Texas recently. He thought the price offered for the Debtor's Second Car was fair, based

on NADA values, and took into consideration the vehicle's condition. *See* Exhs. 32 & 33. He

testified that the interest rate was fairly derived based on the age of the vehicle and the fact that

the Debtor was in bankruptcy and had a prior vehicle repossessed. He thinks he is performing a

good service for persons in bankruptcy, who do not have a lot of options for purchasing a car.

He paid Debtor's counsel's fee for filing the Motion to Incur Debt ($500)[10] and he frequently

does this—considering it a cost of doing business—like advertising—since he knows persons in

bankruptcy are going to incur this cost in connection with buying a car. He said he tells debtors,

"if we can get this done, I'll pay your attorney." He named several debtors' counsel in the

Dallas-Fort Worth metroplex to whom he had paid fees in the past, in connection with debtors

purchasing vehicles during their cases. He said that it has nothing to do with the down payment

that a debtor pays in connection with his/her car purchase (in other words, it was merely

coincidental that the Debtor paid Reid's Auto Connection a $500 down payment for her Second

Car (*see* Exh. 32) and then Reid's Auto Connection paid Debtor's counsel $500 almost

---

[10] General Order 2014-03 ¶ 10(k)(3) in the Northern District of Texas allows debtor's counsel in a Chapter 13 case
to charge a flat fee of $350, plus $50 of expenses, for filing a motion to incur debt.

immediately thereafter). Reid Anderson produced a "Letter of Understanding" he said he had sent to Debtor's counsel's firm on June 23, 2015 (well before the Debtor's purchase of the Second Car) that describes how he will contribute monies to the law firm's client accounts to pay legal fees stating: "It is my wish to assist these clients in paying their bankruptcy balance with your firm and other law firms. I currently, and have for many years, spent an average of $500 or more per client, by mail, direct client, or lawyer referral." *See* Exh. 34. The letter goes on to state that the "contribution is not added to the cost of the car" and—strangely—"No contracts are dated before filing of Chapter 7, and being recorded on PACER." *Id.* In any event, Reid Anderson, when pressed as to why the Debtor already had possession of the Second Car before bankruptcy court approval, and had made a payment thereon and had insured it, testified that the sale transaction was not yet effective but, rather, the Debtor possessed the Second Car pursuant to a "borrowed car agreement." This turned out to be a "Test Drive Agreement" that had no details about how long the Debtor could keep the car or how much mileage could be put on it. (Unmarked Exhibit produced at Hearing #2).

### VI. RULING.

The court hereby denies the Motion to Reconsider. Rule 59 of the Federal Rules of Civil Procedure, as incorporated into bankruptcy contested matters, pursuant to Bankruptcy Rule 9023, applies to the Motion to Reconsider. According to these rules and interpretive authority, this court can take additional testimony, amend findings and conclusions or make new ones, and set aside its previous order disapproving the Motion to Incur Debt and enter a new order, if the court is convinced there is a reason that justifies this, such as mistake, inadvertence, new evidence, or any of a number of other factors. The court has not been convinced by the new evidence and additional arguments that it should set aside the order denying the Motion to Incur Debt.

### a. *What Substantive Authority Applies Here?*

First, what substantive authority applies here?  Normally, whenever one thinks of the topic of postpetition borrowing by a debtor during a bankruptcy case, one thinks of section 364 of the Bankruptcy Code (entitled "Obtaining credit").  However, a careful review of the wording of the statute suggests that this statute does not always apply in chapter 13 cases.  Specifically, section 364(a) of the Bankruptcy Code states:  "If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense."  Then the later provisions of section 364 of the Bankruptcy Code contemplate the obtaining of credit that is either super-priority in status or secured in status, if, among other things, the trustee is unable to obtain unsecured credit as discussed in section 364(a) of the Bankruptcy Code.  But since there is a cross-reference to section 1304 of the Bankruptcy Code in section 364 of the Bankruptcy Code, this statute must also be consulted.  Section 1304 of the Bankruptcy Code provides that a "debtor that is self-employed and incurs trade debt in the production of income from such employment is engaged in business" and, further, that a debtor engaged in business is subject to any limitations of a trustee under section 364 of the Bankruptcy Code.

So what do these two statutes mean when read in harmony?  Perhaps only a chapter 13 debtor that is engaged in business (through self-employment) might be able to incur debt during her case.  However, parsing further through the Code, if one consults section 1305 entitled "Filing and allowance of postpetition claims," it appears to acknowledge the possibility of a chapter 13 debtor *other* than a *self-employed 13 debtor* incurring *consumer* debt postpetition. Section 1305 of the Bankruptcy Code contemplates the ability of a creditor to file a proof of

claim for "consumer debt, that arises after the date of the order for relief" in a chapter 13 case, "that is for property or services necessary for the debtor's performance under the plan" and such claims "shall be disallowed if the holder of such claim knew or should have known that prior approval by the trustee of the debtor's incurring the obligation was practicable and was not obtained." *See also* section 1322(b)(6) of the Bankruptcy Code (that permits, but does not require, a debtor to provide in her plan for the payment of postpetition consumer claims allowed under section 1305(a)(2);[11] it appears that this would have to occur prospectively, since there is no ability to file a plan modification to deal with postpetition debt, in section 1329 of the Bankruptcy Code).

How does this all operate together?[12]  And what if the creditor on postpetition consumer debt has no intention of filing a proof of claim (having no desire to have his claim brought within the terms of the plan) but will simply be paid direct?  It appears to the court that, statutorily, at a minimum, ***the trustee's approval*** is at least required.  Not only does section 1305 of the Bankruptcy Code suggest this, for those postpetition creditors who intend to file a proof of claim, but other Code sections suggest it too.  For example, section 1302(b)(2) of the Bankruptcy Code contemplates that the trustee shall, among other things, perform various duties during a chapter 13 case, including advising and assisting the debtor in performance under the plan, and being heard regarding plan modifications that may be needed after confirmation.  Clearly, if a debtor

---

[11] *See also* section 1328(d) of the Bankruptcy Code which excepts from discharge any allowed claim filed under section 1305(a)(2) of the Bankruptcy Code, for postpetition consumer debt in respect of property or services necessary for the debtor's performance under the plan, if the "prior approval by the trustee of the debtor incurring such debt was practicable and was not obtained."

[12] "Postpetition claims are a complex area of Chapter 13 practice.  The Code and Bankruptcy Rules do not manage postpetition claims very well.  The result is too much uncertainty for debtors and postpetition claim holders . . . and a growing body of case law that is a testament to the lack of clarity in the Code and Rules.  Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, § 302.1, at ¶ [1], Sec. Rev. June 17, 2004, www.Ch13online.com.

desires to incur significant debt postpetition (such as through the purchase of a car with secured

financing) this will bear on performance under the plan.

But there may also be statutory support for the notion that section 363 of the Bankruptcy

Code applies and contemplates actual ***court*** approval after notice and a hearing (not just trustee

approval).  Section 1303 of the Bankruptcy Code (entitled "Rights and powers of debtor") states

that "Subject to any limitations on a trustee under this chapter, the debtor shall have, exclusive of

the trustee, the rights and powers of a trustee under section 363(b), 363(d), 363(e), 363(f), and

363(l)" of the Bankruptcy Code."  Section 363(b) of the Bankruptcy Code addresses how, after

notice and a hearing, a trustee may use, sell, or lease, other than in the ordinary course of

business, property of the estate."   If a chapter 13 debtor is going to buy a car postpetition—and

use postpetition earnings to pay for it, isn't this a use of ***property of the estate*** outside of the

ordinary course of business that needs court approval?  *See* section 1306(a)(2) of the Bankruptcy

Code (which defines postpetition earnings of a debtor while in chapter 13 as "property of the

estate").  *But see* section 1327(b) of the Bankruptcy Code ("Except as otherwise provided in the

plan or the order confirming plan, the confirmation of a plan vests all of the property of the estate

in the debtor"; the Debtor's plan and confirmation order in this case were silent on the issue, thus

her postpetition earnings vested in the Debtor post-confirmation).  At a minimum, it would seem

that the debtor's Schedule J would need to be amended, to provide for the new expense, which

would then cause need to evaluate whether the plan remains feasible and/or whether a plan

modification is needed.

On balance, it seems most likely to this court that the substantive law that applies in the

case at bar can be summarized as follows:  (a) sections 363 and 364 of the Bankruptcy Code

likely only apply in chapter 13 cases if the debtor is engaged in business somehow; (b) as for

chapter 13 debtors who are ***not*** engaged in business, they ***still*** should not borrow postpetition, unless it is for "property or services necessary for the debtor's performance under the plan," consistent with the language and spirit of section 1305 of the Bankruptcy Code; (c) while it is clear that postpetition debt will not be dealt with under a plan or discharged unless section 1305 of the Bankruptcy Code is complied with, and section 1305 of the Bankruptcy Code suggests only trustee approval is necessary—not court approval—notice and court approval are nevertheless necessary whenever significant postpetition debt is incurred by a debtor, ***if for no other reason than because of the possible impact on the debtor's plan and the debtor's prospects for rehabilitation***.  To be clear, arguably, there is nothing in chapter 13 that either authorizes or prohibits the incurrence of postpetition debt *per se*.  And arguably, there is nothing that requires court approval.  However, incurrence of significant postpetition debt is an action that absolutely could bear on the performance of the plan.  It could absolutely impact the debtor's rehabilitation efforts.  Thus, this court will require court approval.[13]

At a minimum, this court thinks that Congress expressed an intent to discourage postpetition borrowing during bankruptcy through Code sections such as sections 364 and 1305.  Moreover, Circuit level jurisprudence has signaled that postpetition activities of a chapter 13 debtor require monitoring and postpetition activities and events ***matter***.  These principles can be gleaned from Fifth Circuit authority such as the case of *In re Meza*, 467 F.3d 874 (5th Cir. 2006) (in a case dealing with a Chapter 13 trustee's desire to modify a chapter 13 debtor's plan post-confirmation, to require the debtor to use part of a $3,029 postpetition tax refund to pay a

---

[13] The prior protocol in this District for car purchases during a chapter 13 case was as follows:  the Trustee had discretion to approval a vehicle purchase so long as it did not involve a luxury car and the overall price was no more than $18,000 and the monthly payment was no more than $475 per month (such caps applied unless the debtor's plan prosed to pay more than 75% to unsecured creditors).  Now, a motion is required to be filed with the court. http://dallasch13.com.

dividend to unsecured creditors, the Fifth Circuit noted that post-confirmation plan modification in chapter 13 "is based on the premise that, during the life of the plan, circumstances may change, and parties should have the ability to modify the plan accordingly"). *See also U.S. Trustee v. Cortez (In re Cortez)*, 457 F.3d 448 (5th Cir. 2006) (involving a chapter 7 debtor that was unemployed at the time of filing a chapter 7 case, and had been for several months at the time of filing, but then obtained new employment four days after filing; the question was whether postpetition events of this sort should matter in determining whether a debtor should be able to obtain a discharge in chapter 7—or, rather, such circumstances should dictate conversion to chapter 13 or dismissal). The Fifth Circuit stated in *Cortez* that postpetition events during a case do matter. Among other things, the court noted that "In a Chapter 13 proceeding, debtors are obligated to amend their schedules to include subsequent income, even if that income is not known or realized at the time of the filing. Section 521(3) requires the debtor to cooperate with the trustee. . . . Even if the plan, as initially proposed, is confirmed, § 1329 allows the trustee to seek a subsequent modification of the plan based on an increase in debtor's income, so that more money is paid to creditors." *Id.* at 457. The court stated that "post-petition events should be considered up until the date of discharge." *Id.* at 458.

In summary, this court believes that the Chapter 13 trustee and court are required to be gatekeepers on post-confirmation activities, to some extent, such as a chapter 13 debtor's desire to purchase a car during her case. A car acquisition has the potential to be a significant change in circumstances. It could impact performance under the plan. It will potentially involve a use of property of the estate (postpetition earnings)—albeit in some circumstances such property will be revested in the debtor. As for the standard of review, this court believes it makes sense to use the same type of legal standard that one applies when evaluating borrowing under section 364 of the

Bankruptcy Code.  Is the borrowing reasonable and necessary?  Is it in the best interests of the debtor and the estate?  Is there a sound business justification for this?  Did the debtor shop and find reasonable market terms?  Was this the most favorable option?  Is this an exercise of reasonable business judgment?  And will this interfere with the confirmed plan?  This is the standard this court will henceforth apply.

### b.  The Nunc Pro Tunc Aspects of the Case At Bar.

Upon further reflection, and after hearing much more evidence at Hearing #2 than at Hearing #1, this court has concluded that the Debtor has essentially made a request for *nunc pro tunc* approval of a purchase of a vehicle and financing that was already effectuated before the Motion to Incur Debt was even filed.  The Debtor paid a $500 down payment before obtaining court approval.  The Debtor has now had the Second Car for more than three months.  She began making monthly payments on it.  She had the car insured.  She has been driving it.  She has put 6,000 miles on it.  Case law holds that bankruptcy courts have the ability to grant *nunc pro tunc* approval of post-petition financing.  *See In re City Wide Press, Inc.,* 102 B.R. 431, 436 (Bankr. E.D. Pa. 1989) & *Gen. Elec. Capital Corp. v. Hoerner (In re Grand Valley Sport & Marine, Inc.*), 143 B.R. 840, 850 (Bankr. W.D. Mich. 1992).  But *nunc pro tunc* approval of post-petition financing is limited to extraordinary or unusual circumstances.  *Id.*

As an example of what might be an extraordinary situation, the *In re Grand Valley Sport & Marine* court stated in a footnote as follows:  "an unsophisticated, honest, non-insider creditor may loan money to a debtor without notice, or actual knowledge, of the bankruptcy case.  In such an instance, the creditor's due process rights may be implicated.  In this type of circumstance, consideration of a *nunc pro tunc* authorization . . . may be appropriate."  *Id.* at footnote 16.  Various courts have applied multi-factor tests in deciding whether to grant *nunc pro tunc*

approval of postpetition borrowing.  Among the notable court decisions are the pre-Code case of *In re American Cooler Co.,* 125 F.2d 496 (2d Cir. 1942) and, more recently, *Sherman v. Harbin (In re Harbin),* 486 F.3d 510 (9th Cir. 2007).  The Ninth Circuit in *Harbin* articulated a 4-factor test as follows in evaluating whether *nunc pro tunc* approval of post-petition financing under section 364(c)(2) is warranted: (1) whether the financing transaction benefits the bankruptcy estate; (2) whether the creditor has adequately explained its failure to seek prior authorization or otherwise established that it acted in good faith when it failed to seek prior authorization; (3) whether there is full compliance with the requirements of section 364(c)(2); and (4) whether the circumstances of the case present one of those rare situations in which retroactive authorization is appropriate.  *See Harbin*, 486 F.3d at 523.

Using this test, the evidence does not meet the burden of showing that the postpetition financing should be approved *nunc pro tunc*.  The terms of this financing are onerous and unfavorable—even though there was some anecdotal evidence that this might be customary in the industry for individuals in financial distress.  While the court understands that the Debtor's life would be easier with a car, the court cannot put the imprimatur of the law on this deal presented.  The interest rate (20.25%) is terrible. When taking into account the "Add-Ons" of $2,690, the Debtor is not only borrowing a total of $16,477.44 for a five-year-old car (which will not be paid off until it is ten years old), but is incurring total finance charges of $9,853.66 over the life of the loan.[14]  The evidence did not demonstrate sufficiently to the court that this is the best option for this Debtor.  The court cannot find the reasonableness and necessity here that the Bankruptcy Code requires the court to find to approve this.  Moreover, Reid's Auto Connection

---

[14] *See* Exh. 28.  The court acknowledges that Reid Anderson testified that there may be a way for the Debtor to reduce her interest rate in the future if she kept her account in good standing and went online and signed up for a "Rate Reduction Program," but this is not any guarantee.  *See* Exh. 25.

did not adequately explain why it would let the Debtor take the car, begin paying on it, insuring it, and driving it without prior court approval. It knew the rules. Most of its customers are in bankruptcy. Finally, this situation is not rare or extraordinary—at least not in the way *Harbin* and its progeny contemplate.

As part of the denial of this Motion to Reconsider and Motion to Incur Debt, this court believes it must, in equity, attempt to unwind and rescind the transaction that occurred among the Debtor, Debtor's counsel, and Reid's Auto Connection. Thus, with the goal of rendering equity, it is:

**ORDERED** that Debtor's counsel return the $500 it was paid by Reid Anderson to Reid Anderson. This disgorgement is just and equitable, since the payment was not disclosed to the court, pursuant to Section 329 of the Bankruptcy Code and Bankruptcy Rule 2016—in fact, it was only disclosed after Debtor's counsel was essentially "caught" in the nondisclosure. The purpose of section 329 of the Bankruptcy Code and Rule 2016 is to create transparency as to *how much debtor's counsel is being paid and by whom*—so that both reasonableness and conflicts of interests can be considered. In a situation like this, conflicts of interest questions are palpable when: (a) a party on the opposite side of a transaction with the Debtor (Reid's Auto Connection), (b) in a transaction that is not very favorable to the Debtor, and (c) is paying Debtor's counsel to get the transaction approved with the court. The court and parties in interest need to be aware of a significant fact like this and factor it into the overall equation. It is also

**ORDERED** that Reid's Auto Connection return to the Debtor the $500 down payment she paid without bankruptcy court approval. It is also

**ORDERED** that the Debtor, Chinique Ward, return the Second Car to Reid's Auto Connection.[15]  Proof of these various ordered actions should be provided to the Chapter 13 Trustee.    Finally, it is

**ORDERED** that, if the Debtor's bankruptcy case is dismissed in the next three months for any reason (as the court expects it may be, voluntarily, in light of this ruling and the Debtor's apparent desire to get a car), the dismissal will be with prejudice to any new bankruptcy filing for 180 days.

## VII.    CONCLUSION:  THE BIGGER PICTURE.

If it was not obvious already, it is now obvious to the court that there are a significant number of chapter 13 debtors acquiring vehicles during the pendency of their cases.  Reid Anderson testified that he has entered into "thousands" of these transactions in the last seven years.  Obviously his 2,400 mailouts per week to individual debtors in bankruptcy in Dallas-Fort Worth have been worthwhile in establishing his business model.

But getting a "new" car (even if it is used) during a bankruptcy case should be the exception and not the rule.  The court recognizes that bad things sometimes happen during the three-to-five years that a chapter 13 debtor is in a bankruptcy case.  Car wrecks and costly car repairs are going to occur.  Indeed, this court frequently hears about these predicaments in different contexts—including sometimes when a debtor wants to keep a large tax refund to help with a car.  This court fears, however, that debtors are frequently simply "upgrading" their vehicles during bankruptcy—especially if they are being inundated with mailed advertisements enticing them that it is easy and acceptable to do.  The temptation must be irresistible.

---

[15] The court will not order the return to Ms. Ward of the one regular car payment that Ms. Ward made on account of the Second Car.  In equity, the court determines she ought to provide some consideration to Reid's Auto Connection for driving the Second Car for three months and putting 6,000 miles on it.

Suffice it to say that this court will henceforth be scrutinizing motions to incur debt to purchase cars more closely.  Not only should a debtor demonstrate a genuine, strong need for a new vehicle, but this court will ***scrutinize interest rates***[16] and add-ons, and not simply consider the price and monthly payment.  To reiterate, this court will not put the imprimatur of the law on a 20%-plus interest rate.  A rate this high may be customary for a financially distressed person outside of a bankruptcy case in the market place, but this court cannot find that such a rate is consistent with a federal-court-supervised rehabilitation.  This court will not give an advisory opinion as to what interest rate is acceptable in a context like Ms. Ward's.  Like Justice Potter Stewart once stated in a different context, "I know it when I see it."[17]  Indeed, this court would be more inclined to give a debtor a temporary reprieve on her plan payments (say a 90-day slight reduction in plan payments, to allow her to save for a down payment and maybe get a more reasonably priced car at a more reasonable interest rate)—than approve something like this in the future.

#### #### END OF ORDER ####

---

[16] The court regrets not engaging in more scrutiny of interest rates in this context in the past.  Suffice it to say that the multi-day hearing in this case has been enlightening.  The court understands that there is a United States Trustee investigation of the practices of Reid's Auto Connection.  At this juncture, the court is not taking any further action with regard to Reid's Auto Connection, pending the outcome of that process.  Moreover, the court notes that it has another matter currently under advisement involving similar practices of a car dealership known as New Start Auto.  In the other matter, *In re Netoche Fair*, Case #15-33400-sgj13, this court has "show-caused" a certain debtor's counsel's law firm who has acknowledged accepting fees from New Start Auto on more than 100 occasions (*i.e.,* on behalf of more than 100 debtor-clients who were purchasing cars from New Start Auto) without ever disclosing it to the court pursuant to section 329 of the Bankruptcy Code and Bankruptcy Rule 2016.

[17] *Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Justice Stewart concurring opinion).